Thank you. Next matter on calendar is Leonorilda Ochoa versus City of Mesa and a public entity at all defendants, appellees. And my understanding is I've been advised before we start the clocks that each side has 15 minutes. My understanding is that the appellees have elected to divide their time and that the City of Mesa will take eight minutes and the Town of Gilbert will take seven. Am I correct on that? Duncan Stoutner Good morning, Your Honor. Yes, this is Duncan Stoutner for the City of Mesa police officers. And that is fine. I was planning to take equal time with the Town of Gilbert. And I have no problem really either way with that. All right. Well, we can do it that way. But I think that they so you want to do seven and a half and seven and a half. Is that what you want to do? It's it's at your discretion. Well, in terms of the timing, I'll I'll I can I can watch the clock. But I think so. What do you want each one? Seven and a half would be would be perfect. I think. Thank you. All right. We'll do that. I'll just what you can just set it at. I know it's hard to set it on the half, but that's fine. I'll just watch it. Thank you. Thank you. All right. We'll begin then with I think Miss Broaddus, I believe you have 15 minutes total. Did you wish to reserve any time for rebuttal? Five minutes, Your Honor. All right. So go ahead. State your name and your appearance and we're ready for you. Thank you. May it please the court. My name is Jody Broaddus and I represent the plaintiff in this matter who are the statutory beneficiaries of Sergio Ochoa. And in this case, this was a case that was disposed of in the lower court by summary judgment. And what's really at issue here is the disputed facts in this case. And what the lower court has done is it provided its own factual determinations, which were based on disputed facts that were better left to the jury. Specifically, there's no dispute that Mr. Ochoa was in the backyard and he was about 10 feet away from. Well, I think the disputed facts have to be material because I think we can look at any case and we can come up with something disputed. So it needs to be material. So I think one of the things like that you talked about, for example, so I would ask you, why is the mental state of the women inside the home, including whether they are welcomed by Mr. Ochoa relevant since the officers didn't have that information and we're seeing it from the officer's perspective. So I think that's one area that you are attempting to establish a disputed fact. But why would that even be? Why would that be material? Your Honor, I agree with you. It's a fact that is in dispute, whether it's material is here. It's right that it goes into the officer's mind at that point why they entered the home. And we're not saying that they didn't have a right to enter the home or even go into the backyard. The disputed facts that are really critical and material in this case. Tell me what the disputed facts are and why they're material. Do you dispute that Mr. Ochoa had the two kitchen knives when he was shot? Do you dispute that? No, Your Honor. Okay. So tell me what you do dispute. What we dispute and let me first of all, what I'll tell you is that we dispute that Mr. Ochoa was going taking any steps towards the officers. The officers were on the patio. And what happened is this dog, the canine was released. And in response to that, Mr. Ochoa stepped backward and away from the officers. He wasn't imposing a threat. His arms were still down by his side. His reaction was a natural consequence of a dog coming at him. And so he stepped backwards and away from the officers at that point is when he was shot 30 times. There was no imminent threat towards the officers at that time. Yes, he was standing at about 10 feet away with the knives by his side. But it was this release of the dog, which was in violation of their own policies. Well, maybe you can help me with something that I'm, I understand we have the 14th amendment claim here. So what is the procedural status of the fourth and the eighth amendment claims alleged by Mr. Ochoa's family and their complaint? Because that's not before us, right? Correct. So what is it? What's the status of that? Well, the eighth amendment claim doesn't apply in this case. It's the fourth and 14th amendments, which are dealing with the violation of their constitutional rights to familial association. That's what's at stake. Did Mr. Ochoa's estate separately asserted a fourth amendment excessive force claim relating to this shooting? No, Your Honor. Okay, so that doesn't exist. I'm just curious, why not? Why did the estate not file a claim? It was just never done in this case. In Arizona, usually your claims die with you. And at that point, the family wanted to just pursue a wrongful death claim, state based claim as well as their constitutional violation of the right to familial association. Hmm. So it really increases your burden of the standard or proof required to prevail in a 1983 action where you only bring it as a 14th amendment companion loss of companionship as opposed to the estate's claim or his own, you know, the excessive force used against it. You're correct, Your Honor. Okay, well, we've got the pleadings as they stand. Yeah, Your Honor. Yes, you are correct on that. So it is a limited argument here. And this disputed fact is material as to whether there was really an imposed threat upon the officers at the time that he stepped backward and away from them. The court, the lower court made a determination that they made a step towards the officer, the body cam footage doesn't show that and actually the expert witness who's a police procedures expert has determined that the video is not consistent with what the police officers. Okay, I have to we're constrained to the record we have in front of us. And I think one of the things that comes up and I'm curious that you allege that the officers laughed and cheered when he was shot and that there's mention of a video what part of this submitted record or expert excerpt show that I couldn't find it anywhere in the record. The officers dispute that I understand that but you say that the record shows that I didn't find it anywhere in the record. Where is it? I believe it was submitted. But I apologize, Your Honors for that. It's also through the expert witness testimony, or the expert witness who provided that type of information that is said it says it's the video, but there's no video in the record that shows that. So how do I know that? I believe the defendants submitted the video and I apologize, Your Honors. They did some also still videos that show this step. And none of that. There's no evidence that was submitted that these steps were towards the officers. The evidence showing that the materiality of that point because the first question is did the officer essentially have time to reflect on what they're doing and they encountered highly dangerous situation in a house with multiple reports of somebody who is armed and dangerous and there were children in the house. And then they all found themselves pretty quickly on the back patio dealing with somebody who is not following their instructions. Well, it happened very quickly. You're correct. And that when they went into the backyard, he wasn't standing there in the middle of the backyard. There was an arc that they posed on the patio. And at that point, he was not opposing an immediate threat. Was there a man standing there with two knives? Well, but it's not disputed that there's a man up on the roof throwing kids trying to get kids out of the house and evacuate them. And the officers are faced with what they believe to be a very fast developing hostage situation, which doesn't seem to be disputed that someone's putting kids locked in a room and putting kids out through a window to get out. Is that disputed? No, there was a gentleman on the roof that was doing that. That's correct. But at that point, when the officers... You're saying that didn't happen? No, that did. Okay, that's undisputed. Okay. And they have two hot calls going on before the officers get, they don't know Mr. Ochoa. They finally, they get to these two calls of people calling on him. And then it becomes evident that he's going over to this place. And then you've got someone on the roof, throwing kids out the window and all of that. So it is very, and the video that I have that I think we've all watched is very, it happens very quickly. That's correct, Your Honor. It does happen very quickly. And what happens and when the shooting occurs is when it's in the middle of the backyard, there's no kids, there's no other people back there except Mr. Ochoa, who's in the center of the yard with his arms down by his side, and the officers. He's holding two knives, they're yelling at him to drop the knives, he's swearing at them and saying to kill him. I mean, this wasn't just like some casual encounter in the backyard. There was no evidence of him swearing or doing any type of, he was just standing there. And the officers were yelling, it was a, there was commotion going on. There's also a patio light that was shining in his face, in Mr. Ochoa's face, where he would be unable to see these officers and what they're doing. But he's just standing there at this point. He's standing there making any movements with his arms by his side. I mean, and I understand, and we're not disputing that the officers had an impression of a scenario. Now, the scenario may be different than what those officers really were anticipating, but we don't dispute that you take this from the view of the officers. So when they come into the backyard and form this arc, and Mr. Ochoa is just standing there, and the dog is immediately released in violation of their policies and he takes a step back, then that's not a threat. A jury could reasonably interpret that as being a natural consequence of a dog coming at him without being a threat towards the officers. Was it only the gun or, I mean, was it only the dog or was it also a beanbag shotgun? Was there a shotgun? They had to, I apologize, I didn't mean to- No, was it, was it, was, what, an officer discharged the beanbag shotgun round? That was at the same time that all the officers shot their- The evidence seems to say that the beanbag was first and it didn't stop him. Are you disputing that? Absolutely, your honor. They were all shot simultaneously. I thought the record reflected that the beanbag, what they call the non-lethal round, was the same time simultaneously with the release of the dog, but both- That's incorrect. That's incorrect? Yes. So what, he was shot 30 times with bullets and with a beanbag round all simultaneously? Is that your, what's your- That's correct, your honor. They all shot at the same time, or immediately within milliseconds of each other. So you agree that if deliberation wasn't practical, we're governed by the purpose to harm standard? Well, our expert and his opinions in this case established that based on his experience and his that deliberation was, that they failed to, that there was time for that. That he, it was his expert opinion that there was time for practical deliberation. And that even though this is a quickly, a quick scene that happened rather quickly, there was time to deliberate because what happened in essence is the officer who released the dog in violation of their policies created a situation where Mr. Ochoa stepped backward and away from the officers, and then they shot. So if they were perceiving a threat by him stepping backwards, that was actually created by the officers themselves. Well, is it true that under the 14th Amendment, your overall, whether we use the purpose to harm or the deliberate indifference, both of those are subsets of shock to the conscience. Isn't that what you have to establish? Certainly, and our position is, is that when you shoot a man or a person who is not opposing an immediate threat, it's not only a constitutional violation, but it shocks the conscience. If there's not an immediate threat, that shocks the conscience. All right. You're down to three and a half minutes. Do you want to reserve the balance of your time? Yes, I do, Your Honor. Thank you. Okay. Thank you. All right. We'll go with the city of Mesa first. Is that correct? Yes. Thank you, Your Honors. May it please the court. My name is Duncan Stoutner. I represent the city Mesa police officers in this case, picturing them in the backyard forming an L with the bottom of the L from right to left being Officer Salaya, Officer Gamby, and then as moving up, Officers Savage, Nicholson, Hermes, and Sergeant Stout. In that backyard, obviously, were two additional officers who were employed by the town of Gilbert, and that would be Officer Madueño who operated the body camera and the canine, and then Officer Gilbert as well on the very top of that L. You know, this is a case that had a tragic ending, and it is obviously a case that's documented on video where based on what I think we've just discussed, the standard is clearly only regarding the 14th Amendment. There is no 4th Amendment claim. This is just beneficiary. Were you the one that submitted a 28J letter? I was not. I am aware of that letter. Okay. And was that on a 4th Amendment case or a 14th Amendment case? Going off of memory, that was a 4th Amendment case, Your Honor, with a fact pattern where qualified immunity was applied in the following sense. An individual who was acting in an erratic manner was in a garage, and when police approached and informed him, they were just checking on him. And again, this is off of memory. Okay, I guess it was Mr. Grasso, so I could talk to him about that, but my understanding is the 4th and the 14th aren't exact. They're not totally interchangeable. That's my understanding as well, and I think Mr. Grasso may indicate his general point being that even under the 4th Amendment analysis, qualified immunity was applied there. But getting back to this point, Your Honor, the two main points here are as follows. There was no actions by any of these officers that shocked the conscience. The purpose to harm standard is clearly the correct standard, as the District Court found, and the officers are entitled to qualified immunity for this reason. There is no case on point with facts analogous to this case. No controlling case that would indicate that these officers somehow violated the right by acting without a purpose. The District Court didn't do the qualified immunity analysis, correct? That is correct. If we agree with you on the purpose to harm, do we need to do the qualified immunity? It's sort of a belt and suspenders approach. Yeah, I would defer to Your Honors on that. I would just say that I think there is an ability to do that, but it's not obviously necessary if that's the ultimate ruling. Getting back to this sort of concept of the dangerousness that I believe you've all understood, I just want to very briefly point out the following. This is a circumstance where this individual was, according to radio traffic, involved in what became two separate incidents before we get to the house at issue. And these officers, these Mesa officers, learn these things by their radio traffic and communications. They learned that there was a domestic violence dispute at one house. There was a reference to a gun. There was a reference to some sort of confrontation and this individual fleeing in a car. Eight minutes later, at a very close residence, an individual was inside of a house, a stranger, unwelcomed, who was indicating that he was stabbed. He also had two knives reportedly with him. And then he fled again, followed by a failure to yield just a period of time later. These officers were requested to surveil the area, to surveil the car. They ultimately found him fleeing his car, going to this residence, where they were alerted to the residence. Is it this 629 East Caffey residence? Yes, I understand all those circumstances leading up to the final confrontation outside behind the house. So clearly the officers were very concerned about this guy. Sounded like wild and crazy. But the fact is, right at the final time, here you've got eight or nine officers all armed with guns pointed at this guy standing there with two knives. But the two knives are just by a side in one hand, not even one in each hand. And all of a sudden they have the dog released on him. And then 30 times he's shot. I mean, that sounds a little bit excessive force to me. Well, one response would be, Your Honor, that there can be findings of excessive force in cases where the 14th Amendment purpose to harm standard has not been violated. But I would submit to you that the axon video objectively documents that those hands were not down the entirety of that time. And as you've mentioned, the short duration of the incident is documented by the video. Those knives are pointed out, so to speak. They're being held. The arms are moving. There's constant motion. And ultimately there is the furtive type of movements and movement in a direction that the district court characterized as towards the officers. And the explanation is, certainly there's no chance to deliberate here. But certainly it is undisputed that every officer believed that this was an imminent safety threat. And it was a threat toward the officers on the patio. That's my question. They really, do you think with eight officers all armed with guns pointing at him, did any one of them really felt in fear of their life from this guy at the time they released all this barrage of bullets? Well, yes, I do believe those officers. The distance was 16 feet with the knives in hand. And that's the point to remember, that these are officers with knives in hand and the direction of the travel was toward that patio. Well, now knives aren't stopped by a vest either. Is that correct? That's correct. You know, one point to make your honor is that, you know, there was, you know, observation by these officers that this was an individual who was agitated, who was angry, who was obviously making comments. There is no testimony from the appellants as to, you know, any firsthand observations in that backyard. The occupants in the house were in the house still. And the officers believed that they needed to stop this individual from perhaps getting back into that house. We have a couple of specific record questions. I think we've all seen the videos. We've looked at all of this. Was the beanbag, the appellant said that the beanbag was simultaneous to the lethal force. What does the record show on that? Well, I would say that the statement of facts by the city were that the beanbag was deployed. And the next statement of fact is regarding Mr. Ochoa's actions and then the use of lethal force. So the plaintiffs have certainly not established the fact that the beanbag did not take place at that same time. In fact, with regard to the statement of fact about the beanbag use, it was not disputed in that manner. But moreover- What about the laughing of the officers? I couldn't find that in the record. Is it anywhere in the record? I believe it's not in this record. There were two acts on videos. One was from the perspective of the canine. And from that perspective, obviously it portrays the officers firing and the deceit of Mr. Ochoa's actions. The other acts on camera by the town of Gilbert officer was from a different perspective and a different timing in terms of that individual getting into the backyard to see the events. But in terms of acts on video, body camera video, I don't believe that is part of this Ninth Circuit record. What I will say, Your Honor, is that at the 32nd mark of this video, it is objectively clear that Mr. Ochoa is on the ground with at least his right hand underneath his body. And the officers were unable to verify the location of those knives. And I think that was what precipitated the use of the town of Gilbert's canine at that point. Let me go to, you're already over time. So the question that I have is whether either of my colleagues have questions. No. They do not. So we're gonna go over then to Mr. Grasso who has seven and a half minutes. Thank you for your time. You have to unmute yourself. Mr. Grasso, I see you're unmuted. Your microphone's also not working. I apologize. Is it working now? Yeah, we've got you. Thank you. I apologize, Your Honors. May it please the court, my name is Robert Grasso and I represent the town of Gilbert and Officer Steve Gilbert and Officer Jacob Madueno. To be clear, this is just a 14th Amendment case. The district court analyzed whether these officers' conduct violated the 14th Amendment and the court concluded it did not. They did not. The court did not reach the qualified immunity issue and this court does not need to reach the qualified immunity issue. I think it is perfectly clear in this case, based on the undisputed facts, the undisputed material facts, that this was a fast-paced situation involving life-threatening considerations and these officers were forced to make snap judgments about not only taking care of the safety of the women in the house, the children in the house, their own safety, but neighbors in the area. Without question, under the Ninth Circuit and under the Supreme Court precedent in Lewis versus Sacramento County and all of the Ninth Circuit precedent, the purpose to harm standard applies in this case. And there is absolutely no evidence in this case that any of these officers acted with a purpose other than the legitimate purposes outlined by the district court. Self-protection, protection of others, and to basically stop this threat in the backyard. What I heard plaintiff's counsel say, and I want to address this because I think it's the most significant thing to remember in this case, it seems that the plaintiff or the appellant's arguments are focusing on this video. The video is absolutely critical and we believe, as the district court did, that the video shows clearly that Mr. Ochoa made a movement to his left toward the direction of the officers at the time he was shot. But I respectfully submit to your honors that any movement from this man at that point in time, at this stage of these events, would have been perceived by a reasonable officer as both unreasonable and creating a danger. So I guess if I'm understanding you, and I just want to make sure you're saying, it doesn't really matter whether he moved a little back, whether he moved a little left, or whether he moved a little forward. The distance basically is undisputed and the knives and the time it takes to travel with knives towards someone. So we don't have to decide whether it was back to the side or forward. Are you saying that's not a material disputed fact, even though it might be disputed because the appellants take a different position on that? I think your honors point is 100% correct. It doesn't matter if he was moving a little, if he was moving with a sidestep. The fact is it is undisputed that he was within 16 feet of the officers at the time with edged weapons. And your honors may know this, there's something commonly referred to in the old days in these police cases, the 21 foot rule. A 21 foot rule is that's the amount of space where somebody can close the distance on an officer with an edged weapon. And they're in grave danger at that point if they're within 21 feet. This was much closer to that. But the other point I wanted to make is when the plaintiffs wanna just focus on this one piece of the puzzle, they're ignoring, I think what Judge Bress appropriately was suggesting is that there was more to it than that. We have a situation where we've got, it starts off as a 911 call with a gun, with a guy on drugs, who's now fleeing from the police, who enters a stranger's house, leaves with knives, goes to a house where it's so bad, they're evacuating children from a roof. There's police cars, you can see in the video, lights blaring and everything. Mr. Ochoa knows that these officers are outside. He was commanded while he was in the house, waving knives with these women to drop the knives and come out, yet he refused. He forced the officers to make the decision that they needed to enter at that point. And I heard Ms. Brodess say she didn't disagree that it was appropriate for the officers to enter. And then from that point forward, we're dealing with 16 seconds when he, again, choose to comply with commands, didn't stop, goes to the backyard, continues to confront these officers, and then ultimately forces them to take the action that they needed to take to protect themselves, the people in the house, the children, and the people in the neighborhood. He's right next door to a blocked wall and this is a small neighborhood. I want to strongly emphasize this. This suggestion from plaintiff's expert that this situation was created by the officers is wrong. This situation was created by Mr. Ochoa. Mr. Ochoa had multiple opportunities, multiple opportunities during this crime spree, including while he was at the house, to put this to a stop. When he's told to drop knives, he should drop the knives. He should hit the ground. He should comply with these officers' lawful orders. So coming in now and trying to suggest that, oh, well, he wasn't a threat to these guys, that's outrageous, Sean. I mean, the reality is, this was a dangerous fleeing felon who was exposing a bunch of people to risk and these officers were doing the best they could to get him under control. The fact that seven officers saw the same thing and believed that deadly force was appropriate simply proves the point here that Mr. Ochoa posed a significant risk of harm to these officers. Was the dog released before or after he was shot? It was like one second before, Your Honor. If you look at it, it's our excerpts of record at four on the video. At about second four in the video, the dog is released by Officer Madueno. And at that point, he does the lunge afterwards. At second five, the district court correctly said, he takes that one large step to the left toward the officers. That's when the shots were fired and he goes down in the video. Can you tell from the video when the beanbag went? I mean, it doesn't make any sense to me that the beanbag would be at the same time, but it could be very close. Yeah, my understanding is, Your Honor, this was happening very, very quickly. And I can tell you, I believe that the beanbag got deployed simultaneously with the dog. It was like maybe a second or so right before. But I don't think the video is gonna depict that for Your Honor. Every officer doesn't have a beanbag gun, right? That's absolutely correct, Your Honor. So every officer has a gun, but then the police has a beanbag. Absolutely, Your Honor. Because I know my time is very short. I found a case that Judge Callahan authored in 2014 called Law v. State of California. And I would urge you to take a look at that case because it does address a key issue that I think the plaintiffs are trying to make in this case. Is that Fourth or 14th Amendment? Actually, this is Fourth. So it's actually better for us in some sense. Your Honor, you ended up affirming summary judgment in a Fourth Amendment case, which is a lower standard. This isn't a Fourth Amendment case. Why don't you give us a citation if you have it? I will, Your Honor. It is 746 F. 3rd 1112. Thanks. It was filed March 31st of 2014. The case is significant because as I think I heard Ms. Broadus say, they argued in that case that the officers should have somehow slowed things down, diffused things, retreat from the situation. They had an expert witness come in and suggest that the officers, they just didn't handle the situation correctly. And they're the ones who created this danger that existed. And I've already spoken to, I think it's outrageous to suggest Mr. Ochoa created this, not the officers. But Judge Callahan quoted some Ninth Circuit cases. And I just want to briefly read a portion of a quote. She's quoting the Billington versus Smith case. And she's saying she disagrees with the perspective of the plaintiffs when they try to suggest a plaintiff may not avoid summary judgment by simply producing an expert's report that the officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless. The point of that case, and it was picking up on several other Ninth Circuit cases that she cites too, of the Penn site, for your honors, it's on page 1118, is that the court is not going to come in under well-established Supreme Court and Ninth Circuit precedent. And second guess with 2020 hindsight, having an expert who's now years after the fact, sitting in an office someplace on his computer, coming up with scenarios where maybe they could have done it better. And that's just not fair. That's inconsistent with what the United States Supreme Court has told us, what this court has told us. When the officers under Graham versus Conner, we can go back to the case that set the stage, it has to be evaluated based on the perspective of the officers, not with 2020 hindsight, based on the information they had at that time. And at this incident here, these officers were dealing with a man who had committed a violent act to start these events off that triggered a 911 call, was on a crime spree that night, ends up in the backyard where there are women being threatened, children being threatened. And then despite numerous commands from police officers to drop two very large knives, you have photographs in the record, he refuses to do it. And then he takes a movement toward the officers. And whether- All right, you're over time. So unless my colleagues have additional questions, I'm going to call your time. Thank you, Your Honor. Thank you. All right, we'll go back to the appellant for rebuttal. We're ready for you. Thank you. I had my computer on mute, so I had to unmute it. I apologize. One of the things that was addressed is at least brought up is that any movement he would have made constitutes a threat basically and allows someone to use deadly force. That's contradictory to two separate cases that we cited in the brief to you. One of them was the Estate of Lopez. The other one is the Nicholson case where both of those cases, which are Ninth Circuit cases, one was in 2019, the other one's from 2017, that says that it's reasonable that a jury can determine that movements are not a threat. And that's what we have here is a movement that was not a threat. It was a step that was away from the officers. The lower court made a factual determination as to that. It's a disputed fact, yet the court said, oh, I'm going to decide that it was towards the officer. When both the video and the expert has testified that the video is not consistent with what the officer said. In both of those cases that were cited, we were dealing with individuals who had firearms. And one of them was with a firearm who was down by his side and he lifted it a little bit when he was turning and the officers shot. And the court said that's not, that does not mean there was an imminent threat. It could be a natural consequence of the circumstances. And that's what we have here. You have a canine going directly towards someone and he steps backwards and away from the officers. It's a natural consequence. A jury could determine that that's a natural consequence and not an immediate threat. So I disagree with opposing counsel that any movement that someone makes authorizes the officers to use deadly force. And I know that there were specific questions that were brought up before. Just looking through my notes here, I apologize, Your Honor. You know, there was a lot of things that happened before this shooting took place. And I understand that they are taken from an officer's perspective. However, those things are in dispute. And I know, understand that, yes, he was, they thought this guy might be dangerous. For the longest time, they didn't even know if he was a victim of the crime, of the alleged crime or not. A lot of facts have come out. When you say they're in dispute, is it disputed that there were two 911 calls? Is it disputed that he started in one location, went to two other houses? Is it disputed that the officers were advised that he was under the influence of drugs? Or is any of that disputed? I apologize, Your Honor. I did not mean to interrupt you. It's not disputed that that's what was told to them. Whether they were actually true is a separate issue. It's not a material fact, I believe that would, that's an issue here. Those are facts that are in dispute. Whether these events that were alleged to have take place, yes, some of those are disputed. But I don't believe that those are material facts that are relevant to the summary judgment motion. Does that make sense? Sort of. Okay. Well, and again, I'm trying to be realistic here in that it's taken from the officer's perspective. So for example, the first call that was made to the officers is that there was supposedly a domestic violence issue with a gun. And this woman was saying what she told the officers. She ends up changing her testimony later. I understand that while she changed her testimony, that may not have been a true events that actually happened. The officers didn't know that that was false. So I understand that the officers had a series of information that was provided to them. One of which was, they didn't even know- Does it matter here that sometimes, because you're putting forth the theory that the officers kind of brought this, caused this, but it wasn't an officer initiated contact. Sometimes the officers are driving along and they see someone and they decide to stop, what I would call an officer initiated contact or they're going out. But these are initiated by two 911 calls. And it's going. And so the people that are complaining about the officers are the people that ask the officers to be involved. And so the fact that they might change, that they wish they'd never called the police. Now we can't, we can't, we have to stay in the officer's minds here. They were called to deal with this and that's what officers do. You're correct, your honor. And that's why I'm saying I'm not disputing what the officers were purportedly told. My dispute is that when they were in the backyard, it didn't matter what happened before, because now they're presented with a situation where there is a gentleman with two knives at a side. And what happens is fast and they immediately send that dog out immediately and which violated their own policy. Unless my colleagues have questions, you've gone over, I'd ask that you wrap it up in a minute, please. Thank you, your honor. Actually, I will wrap it up now. You guys have heard a lot of information and you have the briefs. Unless you have any other questions, I will go ahead and rest. There do not appear to be any questions. Thank you all for your helpful argument in this case. And this matter will stand submitted.
judges: Gilman, CALLAHAN, BRESS